UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CASE NO. 3:16-CR-31 (RNC) |
| | : | |
| v. | : | |
| | : | |
| THOMAS KAPUSTA, | : | |
| | : | June 26, 2016 |
| Defendant. | : | |

## DEFENDANT THOMAS KAPUSTA'S MEMORANDUM IN AID OF SENTENCING

### Preliminary Statement

At 63 years of age, Thomas Kapusta comes before this Court for the first time to face sentencing for Class-B misdemeanor offenses that are completely out of character and inconsistent with his exemplary record as a caring, selfless man who has been a hardworking and upstanding member of society his entire life.  Mr. Kapusta is scheduled to be sentenced by this Court on July 7, 2016.  In accordance with Rule 32(o) of the Local Rules of Criminal Procedure for the United States District Court of Connecticut, Mr. Kapusta, through undersigned counsel submits this Memorandum in Aid of Sentencing to assist the Court in determining an appropriate sentence.  Mr. Kapusta respectfully maintains that a non-custodial sentence is fully warranted in this case in view of the circumstances of the offense and Mr. Kapusta's background, history, and characteristics, as well as consideration of the other sentencing factors set forth in 18 U.S.C. § 3553(a).

## Background

On February 17, 2016, Mr. Kapusta pleaded guilty to a five-count Information charging him the Class-B misdemeanor offenses of conspiracy to take, capture and kill red-tailed hawks and Cooper's hawks in violation of 18 U.S.C. § 371 and 16 U.S.C. §§ 703 and 707(a), and taking, capturing and killing hawks in violation of 16 U.S.C. §§ 703 and 707(a). In connection with his guilty plea, Mr. Kapusta and the government entered into a plea agreement which is on file with the Court and attached to the Pre-Sentence Report (PSR). Because the offenses charged are Class-B misdemeanors, the Federal Sentencing Guidelines do not apply. Accordingly, the PSR does not contain a Guidelines calculation. The PSR does note, however, that Mr. Kapusta has no criminal history. (PSR ¶ 18). Pursuant to the terms of the plea agreement, Mr. Kapusta has maintained his right to appeal his sentence.

As set forth more fully below, Mr. Kapusta maintains that a non-custodial sentence of probation is fully warranted in this case in light of his history and characteristics, the nature and circumstances of the offense, as well as other factors set forth in 18 U.S.C. § 3553(a). Specifically, Mr. Kapusta maintains that such a sentence is sufficient but not greater than necessary to provide adequate and just punishment given the fact that these Class-B misdemeanor offenses, which were driven by his misguided desire to protect other animals, represent a marked deviation from his otherwise commendable and law-abiding life. In addition, such a sentence would permit Mr. Kapusta to continue to care for his elderly mother and

aunt who rely on him daily.  Respectfully, Mr. Kapusta maintains that these factors, as well as the others set forth in § 3553(a), weigh in favor of a non-custodial sentence.

## Standard of Review

"The standard of review for sentencing is one of 'reasonableness.'" *United States v. Cossey*, 632 F.3d 82, 86 (2d Cir. 2010) (*citing United States v. Booker*, 543 U.S. 220, 260–62 (2005)).  Generally, in order to impose a procedurally reasonable sentence, a District Court must determine and consider the advisory Guidelines. *See, e.g., id.* (citing *United States v. Villafuerte*, 502 F.3d 204, 206–07 (2d Cir. 2007)).  In the present case, however, the offenses charged are Class B misdemeanors.  Pursuant to U.S.S.G. § 1B1.9, the Sentencing Guidelines do not apply to these offenses.  As noted in the Commentary, the Sentencing Commission exempted all Class B and C misdemeanors and infractions from the coverage of the guidelines "for the sake of judicial economy." U.S.S.G. § 1B1.9.  Accordingly, when imposing a sentence, the Court will consider the other factors set forth in 18 U.S.C. § 3553(a), including:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
    (2)    the need for the sentence imposed:
        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B)    to afford adequate deterrence to criminal conduct;
        (C)    to protect the public from further crimes of the defendant; and
        (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
    (3)    the kinds of sentences available;
    (4)    any pertinent policy statements issued by the Sentencing

                Commission;
(5)    the need to avoid unwarranted sentence disparities; and
(6)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). Ultimately, the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). In order to do so, the court must "consider all of the § 3553(a) factors" and "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

## Argument

### I. A NON-CUSTODIAL SENTENCE IS FULLY WARRANTED IN THIS CASE IN LIGHT OF THE SENTENCING FACTORS SET FORTH IN 18 U.S.C. § 3553(a).

    a. Mr. Kapusta's History and Characteristics Warrant a Non-Custodial Sentence

In determining an appropriate sentence, the Court must examine the history and characteristics of the defendant. 18 U.S.S.G. § 3553(a). In so doing, the defendant's "immediate misconduct" must be "assessed in the context of his overall life hitherto" with credit given for "the good he has done." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y 2006). "This elementary principle of weighing the good with the bad . . . was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *Id.* at 514. Weighing Mr. Kapusta's misconduct in this case against the otherwise exemplary life he has led, demonstrates that a sentence of probation is sufficient but not greater than necessary to serve the purposes of sentencing in this case.

4

### i.  *Mr. Kapusta's Background and Work History*

Mr. Kapusta is fortunate enough to have come from a supportive and loving home where his parents "provided the 'basics' and though they were not wealthy, [he and his sister] were well-loved."  (PSR ¶ 23).  Mr. Kapusta's father was a machinist who "often worked overtime shifts . . . in order to ensure his family was well provided for."  *Id.*  Mr. Kapusta's mother also worked full-time as a bookkeeper and Mr. Kapusta and his sister were looked after by his grandparents while his parents worked.  (PSR ¶ 23).

Mr. Kapusta attended Catholic elementary and high-school in Stamford, Connecticut, where he "was a good student who was active in track and cross-country, as well as arts programs."  (PSR ¶ 24).  Mr. Kapusta received a Bachelor's degree in Business Administration from Hofstra University in 1970.  (*Id.*)  Shortly after college, Mr. Kapusta began a long and distinguished career with the United States Postal Service, working as a postal clerk for thirty-four years.  (PSR ¶ 39)  During his career at the Post Office, Mr. Kapusta "received a number of certificates of appreciation, service awards, and certificates of recognition for exceptional customer service . . . ."  (PSR ¶ 39).  Those who know him describe Mr. Kapusta as a "legend at the Albertson Post Office" who was "loved by everyone."  (Ltr. from S. Horowitz)[1]  As Mr. Kapusta's friend Dr. Stuart Horowitz describes, Mr. Kapusta "couldn't do enough for the people that he serviced. . . . People would come to the

---

[1] All character letters cited herein were provided to the Probation Office with a copy to the Court on June 15, 2016.  Accordingly, they have not been separately attached to this sentencing memorandum.

post office even if they did not need his service, just to talk to him." (*Id.*). Mr. Kapusta was known as a "dedicated worker who truly enjoyed his job and assisting customers." (Ltr. from P. Wynn). After thirty-four years of dedicated service, Mr. Kapusta retired from the Post Office in 2012. (PSR ¶ 39). As described in more detail below, though he is now retired, Mr. Kapusta remains very busy caring for family members and lending a helping hand to anyone who needs it.

### ii. *Mr. Kapusta's Family Circumstances and Personal Life*

Although Mr. Kapusta never married and does not have any children, he maintains a close relationship with his sister, mother, and aunt, as well as many friends. In reviewing the PSR and the character letters submitted on his behalf, it is readily apparent that Mr. Kapusta's interpersonal relationships are marked by loyalty, selflessness, and a willingness to help others.

Those who know Mr. Kapusta know him to be a "loyal and trustworthy friend" who "would give you the shirt off his back." (Ltr. from P. Wynn and Ltr. from P. Grumback). Mr. Kapusta's friends describe him as "someone whom I would trust with my life" and "truly one of the best human beings I have met in my lifetime." (Ltr. from P. Grumback and Ltr. from K. Kalenowicz). Several of the character letters provided to the Court set forth anecdotes describing instances where Mr. Kapusta has, without hesitation, been there for his friends and family in a time of need and selflessly given of himself to help others.

Regarding his family life, Mr. Kapusta has taken on the role of patriarch of the family and dedicates a significant portion of his time to caring for his elderly

mother and aunt. (PSR ¶ 36). Mr. Kapusta's mother is 89 years old and currently lives alone at her home in Stamford. As noted in the PSR, Mr. Kapusta worries as his mother's health is deteriorating and she "is beginning to experience some dementia and forgetfulness." (PSR ¶ 36). Mr. Kapusta frequently travels from his apartment in Long Island to stay with his mother to care for her and assist with household tasks. (*Id.*) As Mr. Kapusta's mother notes, she relies on him "more and more to do the things [she] can no longer do for [herself]." (Ltr. from C. Kapusta); (PSR ¶ 36). Mr. Kapusta's mother is no longer able to drive herself, and relies on Mr. Kapusta as "her loyal chauffer" to take her "food shopping, to the drugstore, church, doctor's appointments, or whatever errands need to be done . . . ." (*Id.*).

Mr. Kapusta's mother also relies on him to care for the home and perform the household tasks she is unable to do herself, such as mowing the lawn, cutting the hedges, and shoveling the snow in the winter. (Ltr. from C. Kapusta). Mr. Kapusta's mother and sister both recall the significant efforts Mr. Kapusta undertook in trying to protect the family home during Super Storm Sandy as well as the significant clean-up efforts he undertook after the home was flooded. (Ltr. from C. Kapusta; Ltr. from D. Kapusta).

In addition to assisting his mother, Mr. Kapusta also spends a significant amount of time helping his elderly aunt, who lives in Milford, Connecticut. (PSR ¶ 36). Until the time of his uncle's passing in 2014, Mr. Kapusta, who lives in Long Island, would drive his elderly aunt from Milford, Connecticut to Cromwell, Connecticut on a weekly basis to visit his uncle in a nursing home. (PSR ¶ 36).

Since his uncle's passing, Mr. Kapusta continues to visit his aunt frequently. Because his aunt is suffering from dementia, Mr. Kapusta frequently assisted her with running errands, and helping make sure she paid all her bills on time. (*Id.*). Recently, the health of Mr. Kapusta's aunt took a turn for the worse, and she has relocated to a nursing home. Mr. Kapusta has stepped up and been actively involved in assisting his aunt with that transition.

Mr. Kapusta's selfless dedication is to his family and his willingness to sacrifice his time helping those who need it speaks volumes about his character. In addition, the extent to which Mr. Kapusta's elderly mother relies on him on a day-to-day basis weighs heavily in favor of a sentence of probation which would allow him to continue to be there to help his elderly mother. Weighing Mr. Kapusta's misconduct in this case against this long history of good deeds, indicates that a sentence of probation is more than sufficient to serve the goals of sentencing in this matter. *See Adelson*, 441 F. Supp. 2d at 513-14.

      b. The Nature and Circumstances of the Offense Weigh in Favor of a Sentence of Probation.

As the PSR notes, the offense of conviction in this matter relates to Mr. Kapusta's capturing and killing hawks that were killing his pigeons. (PSR ¶ 54). Mr. Kapusta takes full responsibility for his conduct and wants the Court to know how deeply remorseful he is for his actions. Apart from Mr. Kapusta's genuine remorse, the Court must evaluate the nature and circumstances of the offense in determining an appropriate sentence. *See* 18 U.S.C. § 3553(a)(1). In order to understand the circumstances of the offense in this case, it is important to

8

understand the background of Mr. Kapusta's involvement with raising pigeons and just how much he cares for his birds.  Raising and racing pigeons has been a part of Mr. Kapusta's life since he was born. (PSR ¶ 26).  Mr. Kapusta's father first started raising pigeons after he returned home from the Navy in 1946. (*Id.*)  When Mr. Kapusta was around 12 years old, his "father began teaching him how to care for, train and breed the birds." (*Id.*)  Racing pigeons can be trained to learn where their home is, and, with proper training, will return to their home even when released from a great distance. (*See id.*)  The sport of pigeon racing involves individuals releasing birds they have trained and seeing which birds return home the fastest. (PSR ¶ 27).  Mr. Kapusta's father was involved in a pigeon racing club in the 1960's and he and Mr. Kapusta raised and raced pigeons together throughout Mr. Kapusta's childhood and adult life. (*Id.*)

Although the sport has less and less followers, Mr. Kapusta continues to love raising and racing pigeons "partly in memory of his father" who passed away in 2007. (PSR ¶¶ 19, 28).  Mr. Kapusta "admires the birds he raises and finds them to be incredibly interesting." (PSR ¶ 28).  He notes that the birds "are very loyal, dedicated to their offspring, and display an intense love for home, such that they do all that they can do on race day to get home." (*Id.*).  While it may difficult for those unfamiliar with the sport to understand, Mr. Kapusta cares for and treats his pigeons the way many people care for a family pet such as a dog or cat.

9

Against this background, counsel for Mr. Kapusta highlights the following key aspects of the offense conduct which militate strongly in favor of a non-custodial sentence in this case:

First, Mr. Kapusta's actions in this case were driven solely by his misguided desire to protect his pigeons.  Mr. Kapusta's conduct was undertaken out of desperation after repeatedly witnessing his beloved pigeons be torn apart and eaten by hawks.  Mr. Kapusta understands that his actions were wrong and were not an appropriate solution to this problem, but it is important to note that his sole motivation was protecting other animals.

Second, while they are a protected species under the Migratory Bird Act, Cooper's Hawks and Red-Tailed Hawks are not endangered species.  The International Union for Conservation of Nature and Natural Resources ("IUCN") lists both Cooper's Hawks and Red-tailed Hawks as having a status of "least concern;" the lowest assessment on its list of protected species. See IUCN Red List, *Buteo Jamiacensis, Red-tailed Hawk* (2012), *available at*, http://www.iucnredlist.org/details/22695933/0; IUCN Red List, *Accipiter cooperii*, *Copper's Hawk* (2012), *available at*, http://www.iucnredlist.org/details/22695656/0. The IUCN notes that the populations of Red-tailed Hawks and Coopers' Hawks are very large and "do[] not approach the thresholds of Vulnerable . . . ."[2] *Id.*  Similarly, Red-tailed Hawks and Cooper's Hawks are not listed on the State of Connecticut's

---

[2] The increase in the hawk population has led to a number of attacks on humans in residential neighborhoods in Connecticut in recent years.  *See, e.g.*, Reilly, Genieve, *Dive-Bombing Hawks' Nest Removed as Fairfield Attacks Rise*, FAIRFIELD CITIZEN (March, 18, 2016) (noting multiple attacks in Fairfield, Connecticut).

10

list of Endangered, Threatened and Special Concern Species.  *See* Conn. Dep't. of Energy & Environmental Protection, *2015 Endangered, Threatened and Special Concern Species List*, (2015), *available at*, http://www.ct.gov/deep/lib/deep/wildlife/pdf_files/nongame/ets15.pdf.

Finally, Mr. Kapusta endeavored to kill the hawks as quickly as possible so the animals would not suffer.  He felt great remorse for what he was doing, even as he was doing it, but felt he was acting out of necessity to protect other, more helpless birds.

Counsel for Mr. Kapusta highlights these factors not to justify or minimize Mr. Kapusta's actions in anyway.  Mr. Kapusta knows that his conduct was wrong and his is truly remorseful for what he has done.  Nevertheless, these factors are relevant to the Court's assessment, and counsel respectfully maintains that they militate in favor of a non-custodial sentence.

      c.  Promoting Respect for the Law and Providing Just Punishment.

In promptly entering a guilty plea and accepting full responsibility for the offense conduct, Mr. Kapusta has shown ample respect for the law.  In order to provide just punishment, a sentence must be sufficient *but not greater than* necessary to serve the purposes of sentencing.  *Kimbrough*, 522 U.S. at 101; 18 U.S.C. 3553(a).  In this case, a sentence of probation would constitute just punishment for this Class-B misdemeanor offense.

By pleading guilty, Mr. Kapusta has been convicted of a federal crime.  As it does in most cases, the Government issued a detailed press release following Mr.

11

Kapusta's guilty plea. This press release, which did not mention the misdemeanor nature of the offenses, generated significant media attention. There were multiple articles in newspapers throughout Connecticut and New York, including front page and multi-day, follow-up coverage. Local television news stations also carried the story. Reporters were outside Mr. Kapusta's 89-year-old mother's home taking pictures and trying to speak with Mr. Kapusta.

The significant media attention took a toll on Mr. Kapusta who is filled with guilt and remorse for his conduct and for the embarrassment and distress it has caused his family. This embarrassment was particularly salient for Mr. Kapusta's sister, who, as a librarian, was required as part of her job to set out multiple copies of the newspapers carrying the story of her brother's arrest.

For Mr. Kapusta, the stigma associated with being referred to as a criminal in the newspapers and being known as such to his family and friends, is a significant punishment. *See, e.g., United States v. Myers*, 353 F. Supp. 2d 1026, 1031 (S.D. Iowa 2005) (noting that the stigma associated with a conviction and being known as a criminal by family, friends and society is "no small punishment" for one known for high moral standards and character). In addition, Mr. Kapusta, who is not a man of significant means and is on a fixed retirement income, has endured a significant financial burden as a result of the expenses associated with his prosecution.

In short, Mr. Kapusta has already suffered both reputational harm and financial consequences as a result of his conduct. These consequences, along with

the restrictions on his liberty associated with a period of probation, will provide just punishment for these Class-B misdemeanor offenses, and promote respect for the law. *See, e.g., Gall*, 552 U.S. at 48-49 (noting that probation constitutes significant punishment and "substantially restrict[s] [a defendant's] liberty.").

  d. General Deterrence

A sentencing court must also consider the need for the sentence imposed to "afford adequate deterrence to criminal conduct." 18 U.S.C. §3553(a)(2)(B). Here, a non-custodial sentence will have a substantial deterrent effect on the public. As previously noted, there has been significant publicity regarding Mr. Kapusta's conviction. As courts and commentators have recognized, in cases involving regulatory offenses, the publicity and stigma associated with conviction serves to deter similar crimes, even where a non-custodial sentence is imposed. *See, e.g., United States v. Robinson*, 13-436 JLL, 2014 WL 1400197 (D.N.J. Apr. 9, 2014) (concluding that in a white-collar, regulatory case, "probation best addressed the need for deterrence"); Richard S. Frase, Punishment Purposes, 58 STAN. L. REV. 67, 80 (2005) (concluding that "[w]hite-collar and regulatory offenders are more likely to be deterred even by . . . modest penalties; such offenders have . . . much to lose from being convicted, regardless of the penalty.").

  e. Specific Deterrence

The need for specific deterrence is also a factor the Court must consider in fashioning an appropriate sentence. *See* 18 U.S.C. § 3553(a)(2). Respectfully, there is no such need in this case. As discussed previously, Mr. Kapusta's conduct in this

case is truly uncharacteristic of his otherwise exemplary and law-abiding life.  As the PSR notes, "[g]iven Mr. Kapusta's age, lack of criminal history up to this point in his life, and positive accomplishments (including his employment history), there appears to be little chance of significant recidivism and little need to protect the public." (PSR ¶ 55).

  f. <u>Avoiding Unwarranted Sentencing Disparities</u>

A non-custodial sentence would avoid unwarranted sentencing disparities.  When determining an appropriate sentence, the Court should also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6); *Gall*, 522 U.S. at 54.  A sentence of probation in this case would be consistent with the sentences in other prosecutions for similar offenses.

For example, in a case in the District of California that involved significantly more wide-spread and egregious conduct than this case, all of the defendants involved were sentenced to non-custodial sentences. *See, e.g.*, *United States v. Juan Navarro*, No. 2:07cr00537-E (C. D. Cal. 2007); *United States v. McGhee*, No. 2:07cr00534-JWJ (C. D. Cal. 2007); *United States v. Decker*, No. 2:07-cr-00540-PLA (C.D. Cal. 2007); *United States v. London*, 2:07-cr-00535-CW (C.D. Cal. 2007).  In the District of California cases, members of the conspiracy admitted to killing fifty hawks and falcons per year for several years.  *See* U.S. Fish & Wildlife Service Field Notes, *Seven California Men Charged with Killing Hawks and Falcons*, (May 24, 2007), *available at* https://fws.gov/fieldNotes/print/print_report.cfm?arskey=21447.

Members of the conspiracy were alleged to have trapped hawks and falcons and killed them by shooting them, beating them to death with sticks, and in some instances, spraying them with "a bleach and ammonia solution that created a poisonous chlorine gas and suffocated the birds." *Id.* The conduct in these cases was far more egregious than in the present case and nevertheless resulted in non-custodial sentences.

Similar prosecutions in the District of Oregon and the Southern District of Texas also resulted in non-custodial sentences for all defendants. *See, e.g., United States v. Reed*, 3:07-cr-00198-MO (D. Or. 2007); *United States v. Kaufman*, 3:07cr00197-HA (D. Or. 2007); *United States v. Hanchett*, 3:07cr00196-HA (D. Or. 2007); *United States v. Keng*, 4:07cr00199 (S.D. Tx. 2007). Accordingly, a sentence of probation in the present case is necessary to avoid unwarranted sentencing disparities.

## Conclusion

For all of these reasons, Mr. Kapusta, through undersigned counsel, respectfully requests that the Court impose a sentence of probation.

Respectfully requested,
THOMAS KAPUSTA

By:   /s/ *Nathan J. Buchok*
Nathan J. Buchok
Federal Bar No. ct29132
SPEARS MANNING LLC
2425 Post Road, Suite 203
Southport, CT  06890
Telephone: (203) 292-9766
Facsimile: (203) 292-9682
Email: nbuchok@spearsmanning.com

15

## CERTIFICATION

I hereby certify that on June 26, 2016, a copy of the foregoing Memorandum in Aid of Sentencing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Nathan J. Buchok*
Nathan J. Buchok