UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:16CR31(RNC) |
| | : | |
| v. | : | |
| | : | |
| THOMAS KAPUSTA | : | September 6, 2016 |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum in response to the sentencing memorandum of Defendant Thomas Kapusta [doc. 20]. On February 17, 2016, the defendant pleaded guilty to five violations of the Migratory Bird Treaty Act at 16 U.S.C. § 703 *et seq*. ("MBTA"): one count of conspiracy to take, capture, and kill red-tailed hawks (*Buteo jamaicensis*) and Cooper's hawks (*Accipiter cooperii*) in violation of 18 U.S.C. § 371 and 16 U.S.C. §§ 703 and 707(a); and four substantive counts of taking, capturing, and killing red-tailed hawks or Cooper's hawks in violation of the MBTA. These five violations are Class B misdemeanors and carry a statutory maximum of six months of incarceration and a $15,000 fine for each offense; the maximum penalty is three years of imprisonment and a $75,000 fine. As discussed below, the evidence demonstrates that the defendant and his co-conspirator, Adam Boguski, were responsible for killing 11 protected hawks, at least six of which were captured and killed by the defendant himself.

In his memorandum, the defendant contends that "a non-custodial sentence is fully warranted" due to, among other things, an "exemplary record as a caring, selfless man who has been a hardworking and upstanding member of society his entire life." Defendant's Sentencing Memorandum [doc. 20] ("Def. Mem.") at 1. Although the government acknowledges the defendant's lack of a criminal record, substantial work history, and close relationships with family and friends, the defendant's systematic capture and killing of federally protected red-tailed and

Cooper's hawks in his mother's backyard in Stamford, Connecticut, was willful, deliberate, and cruel. Without any reasonable justification, he trapped federally protected birds of prey, commonly known as raptors, and shot them to death at point blank range. The defendant undertook this pattern of illegal wildlife killing because he perceived the raptors as a threat to his racing pigeons, even though (1) red-tailed and Cooper's hawks naturally consume smaller birds as part of their biological diet as apex predators atop the avian food chain; and (2) the defendant attracted raptors to his mother's property by storing 100 pigeons in a pigeon coop that he and Boguski constructed there. Fully knowing that he was violating the law by capturing and killing the hawks, the defendant instructed Boguski to refer to the hawk trap a "breeding cage" if law enforcement ever inquired.

The government respectfully submits that a judiciously tailored sentence which includes a meaningful custodial component and substantial fine would achieve just punishment, deter the defendant from re-offending, and deter others from engaging in similar violations of the MBTA. The Court's sentence should reflect not only the defendant's repeated, deliberate killings of protected raptors, but also his conscious decision to prioritize his personal hobby over his fellow citizens' collective interest to preserve and enjoy these birds of prey as part of the natural ecosystem. Accordingly, the government respectfully submits that a sentence to a meaningful term of custody and a substantial fine would achieve just punishment, promote respect for federal wildlife law, and most importantly, achieve general deterrence.

I. **THE OFFENSE CONDUCT**

The government's sentencing position is driven by the offense conduct discussed below.

   **A. Background**

The MBTA, 16 U.S.C. § 703 *et seq*., provides in relevant part that it is unlawful at any time, by any means or in any manner, to take or kill, or to attempt to take or kill, any migratory bird. The MBTA provides protection for migratory birds through international cooperation and

treaties, but allows for the hunting of certain migratory game birds within certain seasons and under specific regulations. The MBTA, however, prohibits pursuing, hunting, taking, possessing, capturing, or killing any non-game migratory bird or attempting to pursue, hunt, take, possess, capture, or kill any non-game migratory bird or any part, nest, or egg of any such bird unless authorized by permit. These rules maintain an equitable balance between protection and preservation of migratory birds, and recreational opportunities afforded by hunting. PSR ¶ 5.

The MBTA is the primary federal law protecting native migratory birds, whether a hummingbird or a bald eagle, from unfettered hunting and killing. As the Supreme Court found in upholding the statute's constitutionality, the MBTA involves "a national interest of very nearly the first magnitude" to protect the nation's avian wildlife because, "but for the treaty and statute[,] there soon might be no birds for any powers to deal with." *Missouri v. Holland*, 252 U.S. 416, 435 (1920).

The Cooper's hawk (*Accipiter cooperii*) and red-tailed hawk (*Buteo jamaicensis*) are non-game migratory birds, as defined in Title 50 Code of Federal Regulations (CFR), Sections 10.12 and 10.13, and are protected under the MBTA. *See* National Geographic, Red-tailed Hawk, *available at*, http://animals.nationalgeographic.com/animals/birds/red-tailed-hawk/ at Exhibit A; National Geographic, Cooper's Hawk, *available at*, http://animals.nationalgeographic.com/animals/birding/coopers-hawk/ at Exhibit B. Any person engaged in taking, possessing, or transporting migratory birds for depredation control purposes, is required to first obtain a Depredation Permit as required by the MBTA, and Title 50, Code of Federal Regulations, Parts 13.1, 21.11, and 21.41(a). PSR ¶¶ 5, 6.

A Swedish goshawk trap ("goshawk trap") is a trap that captures hawks and other birds of prey with great efficacy. It is a box-shaped structure constructed of wire mesh and wood that is approximately three-feet long, three-feet wide, and four-feet high. At its top, the goshawk trap

has two hinged doors that open outward.   A wooden bar with a middle hinge lies between the two doors, keeping the trap open and functioning as a trigger mechanism.   Live pigeons are placed in a separate wire-mesh compartment below the trap's wire-mesh floor to act as live bait to attract birds of prey.   When a bird of prey enters the trap and flies down toward the live bait, its body makes contact with the hinged bar.   This contact causes the hinged bar to collapse, thereby shutting the top doors and trapping the bird of prey inside.   The goshawk trap is placed in an open, unobstructed area that is clearly visible to raptors flying above.   If the trap is concealed or obstructed, the hawk cannot view the live bait and will not fly into the trap.   PSR ¶ 7.

### B. 330 Weed Avenue, Stamford, Connecticut

The defendant was a regular visitor to the residence and property at 330 Weed Avenue, Stamford, Connecticut, where his mother resides.   The residence is situated close to the street on a long, narrow rectangular lot that runs to the water line of Holly Pond, a public body of water connected to Long Island Sound.   Holly Pond is surrounded by numerous residences—most of which are situated on narrow waterfront lots—and is used by the public for boating, fishing, and other recreational activities.

### C. The Defendant's Capturing and Killing of Protected Hawks

The defendant is a lifetime racing pigeon enthusiast.   He and Boguski are (or have been) members of the Greenwich and Stamford Pigeon Racing Clubs.   The defendant and Boguski built and maintained a large pigeon coop in the backyard abutting Holly Pond at 330 Weed Avenue to keep their racing pigeons.   In this coop (pictured below), they kept, fed, and raised up to 100 (or more) racing pigeons.   They regularly released the pigeons, so their birds could fly and exercise before returning to the coop.   They would also race their pigeons in competitions, which involved releasing pigeons at locations outside of Stamford, so they could use their homing instincts to fly back to the coop at 330 Weed Avenue.   PSR ¶ 10.



Even though the defendant and Boguski knew that raptors consumed pigeons as part of their natural diet, they still viewed the hawks as a threat to their pigeons. To that end, the defendant and Boguski captured and killed many hawks at 330 Weed Avenue near the Holly Pond waterline using a Swedish goshawk trap. The defendant and Boguski obtained, set up, and maintained a goshawk trap in close proximity to the pigeon coop and Holly Pond for the purposes of capturing and killing hawks.[1] During certain seasons, they adjusted the goshawk trap, and watered and fed the live pigeons in the bait compartment, on a daily basis. After a hawk was captured in the goshawk trap, the defendant and Boguski used a Gamo Big Cat .177 caliber air rifle with attached Gamo Sporter Scope, Serial Number 04-1C-206950-08, to shoot and kill it at close range while the bird was still in the trap. They would shoot the hawks multiple times to kill them, and then remove and dispose of the carcasses. In addition, the defendant told Boguski that they should refer to the goshawk trap as a "breeding cage" if third parties, including law

---

[1] The goshawk trap appears in the left foreground of the photograph above.

enforcement, ever inquired about it.  PSR ¶ 11.

The investigation revealed that the defendant and/or Boguski captured and/or killed protected raptors in the goshawk trap at 330 Weed Avenue on the following dates:

- On or about December 1, 2014, the defendant captured and killed an unknown species of raptor in the goshawk trap at 330 Weed Avenue.

- On or about March 17, 2015, a Cooper's hawk was captured.

- On or about May 3, 2015, a Cooper's hawk was captured (see below).



- On or about September 2, 2015, the defendant captured, shot, and killed a Cooper's hawk (see below).

 

- On the evening of September 6, 2015, law enforcement recovered a Cooper's hawk carcass wrapped in a yellow "Shop Rite" plastic grocery bag from the defendant's municipal trash container that had been left in Weed Avenue. A necropsy of the hawk carcass performed by the National Fish and Wildlife Forensic Lab confirmed that it had been killed by shooting.



- On or about September 8, 2015, the defendant captured, shot, and killed a red-tailed hawk (see below).

 

- On or about October 14, 2015, the defendant captured, shot, and killed a Cooper's hawk (see below).



- Later that same day, the defendant captured, shot, killed, and disposed of a red-tailed hawk (see below).



- On or about October 17, 2015, the defendant captured, shot, and killed a Cooper's hawk, whose carcass he removed from the goshawk trap with Boguski.



- On or about October 21, 2015, the defendant captured, shot, and killed a Cooper's hawk.

 

A search warrant executed at the backyard of 330 Weed Avenue on October 27, 2015, yielded, among other things, a Gamo Big Cat .177 caliber air rifle with scope, as depicted in several photographs above, was located in a hidden compartment in the pigeon loft along with ammunition. PSR ¶ 13. When the defendant was interviewed during the execution of the search warrant, he made several false statements to the FWS agent, including the following: (1) that the goshawk trap was merely a "breeding cage" for his pigeons; (2) that the defendant had never trapped or killed any hawks; and (3) that he did not trap hawks or any other animals. The defendant repeated these false statements even after being admonished by the FWS agent that it was a federal crime to make a false statement to a federal law enforcement officer. PSR ¶ 14.

## II. The Plea Agreement

On February 17, 2016, the defendant pleaded guilty to one count of conspiracy to take, capture, and kill red-tailed hawks and Cooper's hawks in violation of 18 U.S.C. § 371 and 16 U.S.C. §§ 703 and 707(a); and taking, capturing, and killing red-tailed hawks on September 8 and October 14, 2015, and Cooper's hawks on September 2 and October 21, 2015. In other words, the defendant

pleaded guilty to killing four of the six hawks he was charged with personally killing.

These five violations carry a statutory maximum of six months of incarceration and a $15,000 fine for each offense; the maximum penalty is three years of imprisonment and a $75,000 fine. As part of the plea agreement, the defendant has waived all interest in the Gamo Big Cat. 177 caliber air rifle, the related ammunition, and the goshawk trap.

### III. Discussion

#### A. 18 U.S.C. § 3553(a)

Title 18, United States Code, Section 3553(a) provides, in pertinent part:

> (a) Factors to be considered in imposing a sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed–
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> \*\*\*
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and
>
> (7) the need to provide restitution to any victims of the offense.

### B. The Defendant's Intentional, Systematic, and Repeated Killing of Federally Protected Hawks Deserves a Custodial Sentence and a Meaningful Fine

The defendant's criminal conduct, when considered through the prism of the § 3553(a) factors, supports a sentence that includes a custodial sentence and a substantial fine. His actions were not only egregious, but also deprived his fellow citizens of their collective right to enjoy a treasured public wildlife resource.

#### 1. The Nature and Circumstances of the Offense

The defendant's systematic capture and killing of federally protected hawks was an intentional and callous crime. Although the defendant claims that "he felt great remorse for [killing the hawks], even as he was doing it," Def. Mem. at 11, the photographs in this memorandum depict an individual acting without any internal moral conflict. To the contrary, these photos show the defendant focused on the task at hand: aiming his rifle at and killing six hawks trapped in a wire cage, and later removing and disposing of the carcasses in plastic shopping bags. In committing this crime for his pigeons, the defendant punished the hawks for following their natural instinct to hunt and consume smaller birds.

Two aggravating facts underscore the wrongfulness of the defendant's crime. First, there is no dispute that the defendant knew his conduct was illegal. The defendant instructed Boguski to refer to the goshawk trap as a "breeding cage" if third parties, including law enforcement, ever inquired about the trap. PSR ¶ 11. Second, there is no dispute that the defendant and Boguski kept, at times, 100 racing pigeons in the pigeon coop in the small, narrow backyard. By squeezing so many pigeons into the coop and then releasing them on a regular basis, the defendant was attracting raptors to his mother's property, thereby undercutting any claim that his "actions in this case were driven solely by his misguided desire to protect his pigeons." Def. Mem. at 9. In short, the defendant's decision to maintain 100 racing pigeons in a backyard coop on a small waterfront lot

made it inevitable that the hawks would act on their natural predatory instincts to locate and pursue his pigeons as food source.

Next, the defendant failed to appreciate the crucial role that these raptors play in the ecosystem as apex predators atop the avian food chain and often living for twenty years. To him, red-tailed and Cooper's hawks were simply a nuisance that interfered with his enjoyment of a private hobby. But the red-tailed hawk is a physically impressive bird, with a four-foot wingspan and distinctive call, which can dive at more than 100 miles per hour. *See* Letter of Ms. Jenny Dickson, CWB, Supervising Wildlife Biologist, Connecticut Department of Energy and Environmental Protection, Wildlife Division, dated August 30, 2016 ["Dickson Letter"] at 1 at Exhibit C. Moreover, "[m]ale and female red-tailed hawks mate for life and share incubation of the eggs." *Id*. Their diet, which includes rats and mice, contributes to the control of rodent and vermin populations. *Id*. Consequently, "the loss of a single individual [hawk] represents many years of lost reproductive potential which when combined with other natural mortality factors, can ultimately have negative impacts on bird populations." *Id*. at 2.

Similarly, the smaller Cooper's hawk is an equally impressive raptor with "the skill of an aerial acrobat to hunt prey, primarily other birds." *Id*. This species was in steady decline from the early 1930s through the 1970s due to DDT, which "caused egg-shell thinning making the eggs too weak to survive incubation." *Id*. As a result, the Cooper's hawk was listed as a species of special concern under the Connecticut Endangered Species Act in 1993; it was subsequently de-listed in the late 1990s when populations began to stabilize. *Id*.; *see also* https://www.ct.gov/deep/cwp/view.asp?A=2723&Q=325986&pp=12&n=1 (noting the Cooper's hawk recent prior status as a "threatened species") at Exhibit D.[2] A Cooper's hawk relies on its

---

[2] The Court should not be swayed by the defendant's citation to the "International Union for Conservation of Nature and Natural Resources" ("IUCN") to suggest that his crime is less egregious

keen hunting ability because it must consume 12 percent of its body weight daily. In fact, "[e]ven with abundant food and ideal parental care, mortality rates for juvenile raptors range between 70 and 80 percent." *Id*. at 2.

Conspicuously so, the defendant does not acknowledge how his violations of the MBTA deprived his fellow citizens of their right to enjoy the red-tailed and Cooper's hawks as a public wildlife resource. As Wildlife Biologist Dickson points out, these raptors are "valued by residents who enjoy watching them in their neighborhoods and green spaces . . . [with] Connecticut ha[ving] some of the most avid birdwatchers in the country." *Id*. Birds of prey, such as the red-tailed and Cooper's hawk, are highly sought by birders, so that the collective "national economic impact of bird watching is tremendous." *Id*.

Two such birders are Ms. Myra Kreiman Kijek and her husband, Thomas R. Kijek, both residing in Stamford, Connecticut. In a letter to the Court, they shared their first-hand observations regarding red-tailed hawks:

> We have had the privilege of seeing an adult pair of red tailed hawks nest on our North Stamford property for four years. We have watched the devotion with which they feed their babies, watched them take their first flights and learn to hunt. It was a rare treat and gift to do so. Red tailed hawks mate for life. They are devoted and caring parents.

Letter dated July 1, 2016, from Myra Kreiman Kijek and Thomas R. Kijek to Hon. Robert N. Chatigny at Exhibit E ("Kijek Letter") at 1-2. While recognizing that red-tailed and Cooper's

---

because IUCN, a private organization, does not consider red-tailed and Cooper's hawks to be an endangered species. Def. Mem. at 10. The fact remains that both species are protected under the MBTA. Furthermore, the IUCN purports to assess only the worldwide, not the domestic, vitality of these two bird species.

Moreover, in footnote two on page 10 of the defendant's memorandum, he claims that the purported overpopulation of hawks has somehow led to recent suburban attacks in Fairfield, Connecticut. This statement is inaccurate. The hawk at issue in this article is a red-shouldered hawk, which is notoriously territorial, particularly when caring for its young. The FWS special agent who investigated the instant case actually helped relocate these red-shouldered hawks away from the Fairfield residential neighborhood at issue.

hawks are indeed carnivores, they emphasize that these birds "kill to eat, not for pleasure." *Id*. at 2. Despite acknowledging that "[b]reeding racing pigeons as a sport or hobby [should] always entail loss" to natural predators such as hawks, they found that the "cruelty and audacity of Mr. Kapusta is beyond belief." *Id*.

Similarly, in a different letter to the Court, the current president of the Connecticut Ornithological Association stated that "[i]t is difficult to express the outrage we of the birding community felt when this case came to our attention." Letter dated February 20, 2016, by Kathleen M. Van Der Aue, President of Connecticut Ornithological Association, to Hon. Robert N. Chatigny at Exhibit F ("Van Der Aue Letter") at 1. Commenting on how the "history of wildlife persecution is long and ugly," she wrote: "Raptor populations are now rebounding from near extinction from the DDT era of the last century and now are once again taking their crucial place in our complex food web. The very thought that an individual would feel entitled to trap and kill these birds is abhorrent." *Id*.

In short, the government respectfully submits that the defendant's criminal conduct was deliberate and cruel. He appreciated the illegality of his actions, but repeatedly persisted in killing the protected raptors without regard for the MBTA or respect for his fellow citizens' collective right to enjoy a public wildlife resource. The government submits that the defendant's conduct deserves significant sanction, including a custodial sentence and a substantial fine.

    2. <u>The Defendant's History and Characteristics and Need for Specific Deterrence</u>

In seeking a probationary sentence, the defendant emphasizes his lack of a criminal history, his substantial employment with the U.S. Postal Service, and his close relationships with family and friends. Def. Mem. at 5-8. The government is cognizant of the defendant's positive attributes and his history of helping his sister take care of their mother. *Id*. at 7. But these positive attributes and family concern should not be used to shield the defendant from punishment

for his repeated killing of protected wildlife. The government respectfully submits that a custodial sentence would be appropriate punishment for the deaths of 11 protected raptors, at least six of which were killed by the defendant himself.[3] Moreover, by the defendant's own admission, he still keeps 50 racing pigeons at his mother's property and continues to breed the birds himself. PSR ¶ 28. Given the defendant's self-described "misguided desire to protect his pigeons," Def. Mem. at 9-10, the government submits that the Court's sentence should include a custodial component to deter him from killing hawks again in the same fashion.

        3. <u>The Sentence Must Promote General Deterrence and Respect for the Law</u>

This is the first significant MBTA prosecution in this District and presents a disturbing case of animal cruelty. The killing of protected hawks has long been the ugly secret of racing pigeon enthusiasts who view hawks as a danger to their prized racing pigeons. *See* Exhibit F at 1 (noting Ms. Van Der Aue's observation that the trapping and killing of protected hawks is likely "more common in the pigeon racing community than this one instance"). Unfortunately, the illegal killing of raptors is not uncommon among racing pigeon hobbyists, whose pigeons can be valued and sold for hundreds, if not thousands, of dollars. In imposing sentence here, this Court is uniquely situated to deter in this District the illegal capture and killing of hawks, to promote respect for wildlife law, and to show the public that the criminal justice system will treat such wildlife crimes with gravity. *See* 18 U.S.C. § 3553(a)(2)(B) (stating that the Court must consider

---

[3] In light of the defendant's desire to help his sister take care of their mother, the government is amenable to having the defendant serve his sentence during business hours at the United States Marshal's Service ("USMS") lockup at Brien McMahon Federal Building, United States District Court, 915 Lafayette Boulevard, Bridgeport, Connecticut. Acting U.S. Marshal Brian Taylor has informed the government that the USMS can accommodate such a custodial sentence. In fact, in *United States v. Tyrone Brown*, Case No. 03CR237(JBA), Judge Janet B. Arterton recently imposed a sentence of confinement at Wyatt Detention Center for eight consecutive weekends for a supervised release violation, thereby enabling Mr. Brown to further his education and pursue employment while serving his sentence [doc. 37].

the need for the sentence to "afford adequate deterrence to criminal conduct").

Some courts have recently imposed custodial sentences for misdemeanor convictions on MBTA defendants who killed hawks. *See*, *e.g.*, Judgment in *United States v. Robert Lossaso*, Crim. No. 13-8280 (D.N.J. 2014) (sentenced to six additional hours of incarceration for misdemeanor killing of six protected raptors protected under the MBTA) at Exhibit G.[4] Other courts have recently imposed major fines on MBTA misdemeanor defendants who killed hawks. *See*, *e.g.*, Judgment in *United States v. Charles H. Williams*, Crim. No. 5:15-po-11 (D.S.C. 2016) (imposing fine of $75,000 for seven misdemeanor counts of killing hawks in violation of the MBTA and banning the defendant from hunting for a year; sentence is currently on appeal to the district court) at Exhibit H.

Based on the above discussion, the government respectfully submits that one day in jail *for each hawk killed in this case*, served during regular business hours in the USMS lockup at the Brien McMahon federal courthouse in Bridgeport, would be an appropriate sanction. The government further submits that a substantial fine approximating the statutory maximum would be an appropriate deterrent, particularly because the defendant continues to engage in pigeon racing and breeding, and has the means to pay such a fine.

---

4  Although the defense cites multiple cases from the Central District of California, the District of Oregon, and the Southern District of Texas to support his request for a non-custodial sentence, the government respectfully submits that these district courts undervalued the federal wildlife interests at stake in MBTA prosecutions. The government notes that the State of Connecticut, unlike these other states, has a rich tradition of conserving, protecting, and valuing its bird species. *See*, *e.g.*, http://ct.audubon.org/about (noting National Audubon Society's presence in Connecticut since 1943 and the state's establishment of the country's first National Audubon Society Nature Education Center); http://www.courant.com/news/connecticut/hc-ct-key-bird-areas-20160711-story.html (discussing in July 11, 2016, article entitled "State Identifies Five Key Areas Critical to Protecting Threatened Bird Species," CT DEEP's recent efforts to protect habitats for threatened and declining bird species in Connecticut).

## **CONCLUSION**

In sum, the government respectfully submits that, due to the disturbing facts of this case, the Court should sentence the defendant to a just period of custody and a substantial fine payable to the "North American Wetlands Conservation Fund Account," as authorized by 16 U.S.C. § 4406(b) and 50 C.F.R. §§ 20 and 21. A sentence with a custodial component and a monetary fine would appropriately punish the defendant for the egregious offense conduct, and deter him and others from engaging in similar criminal violations of the MBTA.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/ Harold H. Chen

HAROLD H. CHEN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT24432
1000 LAFAYETTE BLVD., 10th FLOOR
BRIDGEPORT, CONNECTICUT 06604
(203) 696-3000

## **CERTIFICATE OF SERVICE**

      This is to certify that on September 6, 2016, a copy of foregoing Government's Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

      /s/ Harold H. Chen

      HAROLD H. CHEN
      ASSISTANT UNITED STATES ATTORNEY